1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

11
12
13
14
15
16
17
18
19

| | |
|---|---|
| PAUL AND KAREN BRICE, husband and wife, individually and on behalf of all others similarly situated, <br>           Plaintiffs, <br><br>    vs. <br><br> DIRECTV, INC., <br> DIRECTV MERCHANDISING, INC., <br> DIRECTV ENTERPRISES, LLC, <br> DIRECTV HOLDINGS LLC, <br> THE DIRECTV GROUP, INC., <br><br>         Defendants. | CLASS ACTION <br><br> Civil Action No. _____ <br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

20

**CLASS ACTION COMPLAINT**

21
22

Plaintiffs Paul and Karen Brice, on behalf of themselves and all others similarly situated,

23

allege the following based on personal knowledge, information and belief, and counsel's

24

investigation and research:

25

**INTRODUCTION**

26

1.     This is a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of

27
28

all persons residing in the State of Washington who signed up for digital television service with

COMPLAINT

- 1 -

Defendants (collectively "DIRECTV") as well as a class of former customers of DIRECTV whom Defendants have charged early cancellation fees ("ECFs").

2.    This action seeks relief on behalf of (i) all former DIRECTV customers residing in the State of Washington, who had their service in Washington, and who were charged an early cancellation fee ("Fee Class"); and (ii) all current DIRECTV customers residing in the State of Washington who are under a lease contract with DIRECTV and subject to an early cancellation fee, at the time of certification ("Commitment Period Class").

3.    DIRECTV imposes unlawfully high and inadequately disclosed fees upon its customers, including an early cancellation fee ("ECF").  The ECF is not rationally related to any damages DIRECTV suffers when a customer cancels her or her agreement early and comprises an unlawful liquidated penalty.  DIRECTV uses this fee to coerce its subscribers into maintaining DIRECTV service, even if the service is poor, unwanted, or cannot be utilized by the customer.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(d)(2), as the aggregate value of the relief sought on behalf of the Class exceeds the jurisdictional minimum amount in controversy of $5,000,000, exclusive of costs and interest, and diversity exists between the Plaintiffs (all citizens of Washington) and the Defendants (Delaware or California corporations with their principal headquarters in California).

5.    This Court has personal jurisdiction over the Defendants because they are actively doing business in Washington, have sufficient minimum contacts in Washington, or otherwise intentionally avail themselves of the markets within Washington through promotion, sale, marketing and distribution of their services in Washington, to render the exercise of jurisdiction by this Court proper and necessary.  In addition, the Defendants' Customer Agreement states that

COMPLAINT                           - 2 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

the "Applicable Law" for interpreting the terms of the Agreement is, *inter alia*, "[t]he laws of the state and local area where Service is provided to [the customer]."

6.     Venue is proper in This Court under 28 U.S.C. § 1391 because Plaintiffs reside in this district, a substantial part of the events or omissions giving rise to these claims occurred in this district, and this Court has personal jurisdiction over Defendants, as described above.

<u>**PARTIES**</u>

7.     Plaintiffs Paul and Karen Brice are husband and wife, and citizens of Yakima, Washington, County of Yakima.  The Brices purchased DIRECTV for personal, family purposes.

8.     Defendant DIRECTV, Inc., is a California company with its principal place of business in El Segundo, California.  DIRECTV, Inc., markets, delivers, promotes and advertises DIRECTV and DIRECTV receivers to consumers throughout the United States.

9.     Defendant DIRECTV Merchandising, Inc., is a Delaware corporation with its principal place of business in El Segundo, California. DIRECTV Merchandising, Inc. markets, delivers, promotes and advertises DIRECTV and DIRECTV receivers to consumers throughout the United States.

10.     Defendant DIRECTV Enterprises, LLC is a Delaware limited liability company with its principal place of business in El Segundo, California.  DIRECTV Enterprises, LLC markets, delivers, promotes and advertises DIRECTV and DIRECTV receivers to consumers throughout the United States.

11.     Defendant DIRECTV Holdings LLC, is a Delaware limited liability company with its principal place of business in El Segundo, California.  DIRECTV Holdings LLC markets, delivers, promotes and advertises DIRECTV and DIRECTV receivers to consumers throughout the United States.

COMPLAINT                                    - 3 -

12.     Defendant The DIRECTV Group, Inc., is a Delaware corporation with its principal place of business in El Segundo, California. The DIRECTV Group, Inc. markets, delivers, promotes and advertises DIRECTV and DIRECTV receivers to consumers throughout the United States.

13.     At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the others.

14.     At all times, each of the Defendants was acting within the scope and course of its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

15.     Additionally, at all times herein mentioned, Defendants were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of the joint venture, partnership and common enterprise.

16.     At all times herein mentioned, Defendants were engaged in a conspiracy to commit the acts alleged herein and each of them, and ratified each and every act or omission complained of herein.

## FACTUAL ALLEGATIONS

**DIRECTV's Service**

17.     Defendants are in the business of providing both standard-definition ("SD") and high-definition ("HD") satellite television service to consumers throughout the United States.

18.     In order to receive DIRECTV's signal, consumers must purchase certain equipment, such as the appropriate satellite dish and receiver box. If a consumer wants to record live television, he would also need to purchase either an SD or HD digital video recorders (DVRs).

19.     Prior to March 1, 2006, Customers would purchase DIRECTV equipment at retail stores such as Sears or Radio Shack, and then contact DIRECTV to activate the receiver via an access

COMPLAINT                                    - 4 -

card sold with the device.  The cost of the satellite dish and receiver box would often exceed $200.

20.     Prior to March 1, 2006, the customer who purchased DIRECTV equipment, would be the owner of the equipment.  As explained by DIRECTV, "Prior to March 1, 2006, set-top receivers provided to new and existing DIRECTV U.S. subscribers were immediately expensed upon activation as a subscriber acquisition …."[1]

21.     If the customer canceled her DIRECTV service, he would contact DIRECTV to deactivate the card, but he would retain the equipment.  The former customer could later seek to reactivate the equipment, or discard, sell, or give away the equipment.  No commitment period for service, beyond month-to-month, existed.

**DIRECTV Abruptly Changes to Its Lease Program**

22.     DIRECTV competes for customers with other satellite providers, such as the Dish Network, and traditional cable providers.  Newer fiber-optic technologies also provide competition as well as internet based television providers.

23.     Customers switching from DIRECTV to a competitor create something DIRECTV referred to as "churn."  DIRECTV sought to reduce churn and keep their subscribers.  In 2006, its CEO Chase Carey stated:

> Subscriber growth in the quarter -- although below expectations -- was consistent with our initiatives to improve the quality of new subscribers and drive lower churn. … our average monthly churn rate is starting to decline -- monthly churn was 1.70% in the fourth quarter compared to 1.89% in the third quarter, resulting in net subscriber additions of 200,000. A key priority in 2006 is to continue improving the quality of new subscribers while driving further reductions in churn.[2]

---

[1]  As seen at, *The DIRECTV Group Announces Fourth Quarter and Full Year 2006 Results*, http://investor.directv.com/releasedetail.cfm?ReleaseID=286317.
[2]  As seen at, *The DIRECTV Group Announces 2005 Results*, http://investor.directv.com/releasedetail.cfm?ReleaseID=286417.

COMPLAINT                                    - 5 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

24.    On March 1, 2006, DIRECTV altered its business model by introducing an equipment leasing program wherein DIRECTV charges a monthly fee to lease the satellite television equipment:

> **Customer Lease Program**: On March 1, 2006, DIRECTV U.S. introduced a set-top receiver lease program primarily to increase future profitability by providing DIRECTV with the opportunity to retrieve and reuse set-top receivers from deactivated customers. Under This new program, set-top receivers are capitalized and depreciated over their estimated useful lives of three years. Prior to March 1, 2006, set-top receivers provided to new and existing DIRECTV U.S. subscribers were immediately expensed upon activation as a subscriber acquisition or upgrade and retention cost. The lease program is expected to result in a reduction in subscriber acquisition, upgrade and retention costs ....[3]

25.    Under the lease regime, DIRECTV claims to own the equipment.  If the consumer fails to activate service on the equipment or does not return the equipment after discontinuing service, DIRECTV will impose a fee that can exceed $480 depending on the equipment.

26.    In 2006, DIRECTV simultaneously introduced, and began extensive marketing for, its new set-top receivers.  These new receivers allowed customers to receive new programming options including high-definition (HD) television and/or digital recording capabilities (DVR). These new receivers also provided a new source of revenue for DIRECTV.

27.    Upon information and belief, DIRECTV switched to the lease program—and the use of early cancellation fees—in order to increase revenue and lower the churn rate.

28.    Since switching to its "lease" model with penalties for early termination or non-activation, DIRECTV claimed in its 2007 Annual Report that it had made "significant progress in reducing average monthly churn—the percentage of customers who disconnect their service each month— to an eight year low of 1.51%."

---

[3]  As seen at, *The DIRECTV Group Announces First Quarter 2006 Results; DIRECTV U.S. Increases Revenues 14% to $3.2 Billion and Operating Profit before Depreciation and Amortization More Than Doubles to $545 Million*, May 04, 2006, http://investor.directv.com/releasedetail.cfm?ReleaseID=286442.

COMPLAINT                              - 6 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

29.    In 2009, DIRECTV noted it had "Higher Full Year Gross Additions Combined with 9 Year Low Monthly Churn Rate of 1.47% Net Additions of 861,000 in 2008."[4]  The DIRECTV Group reported revenues of $5.31 billion in the fourth quarter of 2008.[5]

**DIRECTV's Fees**

*The Customer Agreement*

30.    The Customer Agreement is a classic contract of adhesion:  it is drafted by DIRECTV, and customers may not alter its provisions.  In fact they state that "If you notify us that you do not accept such terms and conditions [as included in the Customer Agreement], then we may cancel your Service as provided in Section 5, as we cannot offer Service to different customers on different terms, among other reasons."  DIRECTV Customer Agreement (April 24, 2007).

31.    If a customer purchases DIRECTV equipment at a retail store, the Customer Agreement is not provided to the consumer at the time of purchase.  Instead, the Customer Agreement is mailed to the consumer or brought by the installers after the purchase.  According to the "Equipment Lease Addendum," "a copy of [the Customer Agreement) is provided to you with your first bill and is available at www.directv.com."  Thus, customers have *already purchased the equipment and begun service* at the time they received the Customer Agreement.

32.    The Agreement does not state a specific "cancellation fee," but only states that "you may be charged a deactivation fee [up to$15.00, and] … If you cancel your Service or change your Service package, you may be subject to an early cancellation fee if you entered into a separate programming commitment with DIRECTV in connection with obtaining Receiving Equipment and have failed to maintain the required programming package for the required period of time." Agreement at ¶5(b).

---

[4]  As seen at, *The DIRECTV Group Q4 Results Cap Record Setting Financial Performance in 2008*, Feb. 10, 2009, http://investor.directv.com/releasedetail.cfm?ReleaseID=364395.
[5]  As seen at, *Investors Relations*, http://investor.directv.com/?footernavtype=5.

COMPLAINT                                      - 7 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

33.     The "Applicable Law" for interpreting the Agreement is "the rules and regulations of the Federal Communications Commission, other applicable federal laws, and the laws of the state and local area where Service is provided to you."  *Id.* at §10(b).

34.     While the Customer Agreement mandates arbitration (*Id.* at ¶9) and prohibits class actions (*Id.* at ¶9(c)), the Agreement provides that, "If however, the law of your state would find This agreement to dispense with class arbitration procedures unenforceable, then This entire Section 9 is unenforceable."

### The Equipment Lease Addendum

35.     On or about March 1, 2006, DIRECTV began using an Equipment Lease Addendum ("ELA") to the Customer Agreement.  The customer does not receive the ELA at the time of purchase; if the ELA is ever provided, it may be mailed to customers, or provided to them at the time of installation.

36.     The ELA provides a "Programming Agreement" and "Programming Commitment."[6]  It states:

> PROGRAMMING AGREEMENT. Within 30 days of provision of DIRECTV equipment to you, or on the date that the professional installer has installed or is prepared to install your DIRECTV equipment, whichever is sooner, you agree to activate each and every DIRECTV Receiver ordered by you or provided to you with any DIRECTV® base programming package (valued at $29.99 per mo. or above) ... DVR service activation ($5.99/mo.) required for DVR leases; HD Access fee ($9.99/mo.) required for HD Receiver leases; and, both DVR service and HD Access fee payment required for HD DVR leases. In certain markets, programming and pricing may vary. DIRECTV PROGRAMMING AND PRICING SUBJECT TO CHANGE AT ANY TIME

> PROGRAMMING COMMITMENT. The programming package(s) must be maintained for a period of not less than (a) twelve (12) consecutive months (for accounts with only standard receiver(s)), or (b) twenty-four (24) consecutive months (for accounts with advanced product(s)/receiver(s) digital video recorder (DVR), high definition receiver (HD) or high definition digital video recorder (HD DVR), including additional DIRECTV receiver(s)).

---

[6]/ References made herein are to the March 2006 Equipment Lease Addendum unless otherwise specified.

COMPLAINT                                      - 8 -

37.    The ELA states (vaguely) the upper end of termination fees the customer faces if he does not fulfill the "Programming Commitment:"

> CONSEQUENCES OF YOUR FAILURE TO ACTIVATE PROGRAMMING OR SATISFY YOUR PROGRAMMING COMMITMENT. If you fail to activate all of your DIRECTV equipment in accordance with This Equipment Lease Addendum, you agree that DIRECTV or an authorized DIRECTV Retailer may charge you a fee, as liquidated damages, of $150 for each receiver that is not activated. If you fail to maintain your minimum programming commitment, you agree that DIRECTV may charge you a prorated fee of up to $150 for standard receivers and up to $300 for advanced products/receivers (*e.g.*, DVR, HD, HD DVR, etc.).

38.    In or about 2008, the DIRECTV altered the ELA.  Rather than a "programming commitment," customers now had a "programming term," and the minimum term on standard equipment was lengthened form 12 months to 18 months.  DIRECTV Equipment Lease Addendum (9/08).    The "consequences" were increased, and the ECF charges went from $150 to $300 to $360 and $480 respectively.

39.    Because a customer does not receive either the ELA or Customer Agreement at time of purchase, the customer is unaware of any arbitration provision or possible fees for early termination or non-activation until *after* she has purchased her DIRECTV equipment and it is installed.  If the customer decides after receipt of the Customer Agreement and ELA to forgo activating her or her DIRECTV equipment, he or she still faces a potential $150 charge from DIRECTV.

40.    In addition, cancelling customers face fees if they fail to "return" to DIRECTV the equipment that the customer purchased, (even if not from DIRECTV). These fees include $55 per each DIRECTV standard receiver; $200 for each DIRECTV DVR Receiver; $240 for each DIRECTV HD Receiver; and $470 for each DIRECTV HD DVR Receiver that is not returned or that is damaged.  DIRECTV describes these fees as "as compensation for a portion of the

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

expenses incurred by DIRECTV in establishing your account and providing you the DIRECTV equipment for your use."   These "return" fees did not exist before March 1, 2006.

41.     The ELA does not disclose to customers how any "pro-rated fee" is determined, or any formula that a customer can use to calculate the cancellation fee she may face depending upon when she cancels.

42.     The ELA does not disclose the justification for the fee—especially once DIRECTV gets back the equipment to re-lease to other subscribers—and how or why it varies.

43.     The ELA does not state why DIRECTV charges $120 more for the early termination of a programming commitment with HD equipment over standard equipment.

44.     The ELA also does not explain why there is no difference in fees for the failure to activate either the SD or HD equipment (both for $150), or why the fact that once any programming package is instituted, DIRECTV needs to increase the early termination fee to $360 or $480 respectively.

45.     DIRECTV solicits customers to provide a bank account or credit card at the time of activation.  DIRECTV will automatically withdraw the ECF from cancelling customers.  If the customer has not given DIRECTV access to a credit card to automatically assess the ECF, DIRECTV will institute collections efforts against the customer.

### *Updated Customer Agreement*

46.     On April 24, 2009, DIRECTV revised its Customer Agreement.  Now, for the first time, it makes reference to the ELA, stating in all caps, "If you obtained receiving equipment during or after March 2006, the Equipment Lease Addendum, available at Directv.com, governs your receipt, use, and return of the equipment."[7]

---

[7]  As seen at http://www.directv.com/learn/pdf/0507ICUSAG5524_CUSTAGREEMENT_ENWEB.PDF, on Sept. 22, 2009.

COMPLAINT                                        - 10 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

47.      The April 24, 2009 Customer Agreement also references the ELA in Paragraph 5

"Cancellation."  The 2007 agreement stated that "if you cancel Service or change your Service

package, you may be subject to an early cancellation fee if you entered into a separate

programming commitment with DIRECTV."  The updated Customer Agreement states, "if you

cancel Service or change your Service package, you may be subject to an early cancellation fee if

you entered into a separate programming commitment with DIRECTV in connection with the

Equipment Lease Addendum, and have failed to maintain the require programming package for

the required period of time."

48.      Thus three years after initiating the leasing program, DIRECTV finally amended the basic

customer agreement to inform purchasers that they lease the equipment – not own it through

purchase – and that a separate "Equipment Lease Addendum" exists and includes early

cancellation fees.  However, the Customer Agreement itself still does not mention what the

commitment periods may be, or the amount of the possible cancellation fees, or the formula for

how the fees are calculated.

**Luring Equipment Owners into Lease Agreements**

49.      When DIRECTV introduced its leasing program, it also heavily promoted new set-top

receivers capable of HD broadcasts, as well as HD DVRs.

50.      DIRECTV uses the upgraded equipment to lure existing customers who bought and

owned their DIRECTV equipment to become lessees of the newer equipment.  When these

customers switch to the newer equipment, their month-to-month subscriptions are changed to

eighteen month to two-year commitments, and face new fees, as well as penalties if they cancel.

51.      DIRECTV's complete change of business model was not adequately explained in the

marketplace, and existing consumers who had previously purchased DIRECTV equipment were

COMPLAINT                                    - 11 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

unaware that any new "purchases" would be treated as a lease. Comments on websites demonstrate This, including as follow

52.     Contrary to public statements that it prorates the ECF, DIRECTV either charges customers or threatens to charge customers the full ECF amounts.

53.     Complaints about DIRECTV misleading its customers may be found on various internet postings.  Just one website, *DIRECTV- Billing Problems*, http://www.consumeraffairs.com/cable_tv/directv_bill.html, contains dozens of complaints that are similar to the experiences of the Plaintiff, and include the following:[8]

- **Anne of Williamsport PA (01/24/09):** My contract expired Nov 2007 and I knew nothing about a new contract, however they said I had a new contract dating from the previous summer. Their TIVO was not working and I called their customer service number numerous times, and they could not correct the problem. We were without TV for about a week. Finally they OFFERED TO REPLACE THE TIVO (including a card that went in it) if I would return the one not working. I did so, and received the new one. Nothing was ever said about a new contract, nor was it mentioned on the monthly bill. The next thing I knew, I received a bill for $175 for breaking a contract. I refused to pay it, and the bill was turned over to a Credit Agency, and is now on my formerly clean credit record. I called them numerous times, but I got the same spiel everytime about breaking a contract.

- **Mike of Indian River MI (01/20/09):** Just another tale of a $300 cancelation fee due to an 18 month contract I knew nothing about after setting up a new box when the old one broke. I knew we were going to move and not use DIRECTV after the house sold, obviously not knowing when it would sell in todays housing market. Had I known about the 18 month extension I would have taken the box back to the store.  After complaining to customer service (don't bother)I was told that the contract is extended when I purchased the box and contract information was printed on my sales receipt. That's right!! The sales receipt I got AFTER my purchase. After spending a couple weeks explaining to the helpless help I Googled DIRECTV complaints and found This page. My mouth dropped after seeing and reading hundreds of stories just like mine. If anyone takes them to court, count me in. I am now going to email all to warn my friends about DIRECTV.  I paid $300 to end a contract I never knew about.

- **James of Poolesville MD (01/02/09)**:  I was a customer of Directv for ten years. In 2007, I called them to get service for my newly purchased High Definition TV. Directv was not able to provide service like they could with a normal TV. I was told by service rep that I would have to cut down a large tree in my backyard ($3,000), or get another provider. I chose the latter option.  Directv charged my credit card an early termination fee even though I asked them not to do This. Now they have given my name to a bill collector.

---

[8]/  Any typographical or grammatical errors in This section were seen in the original content.

COMPLAINT                                    - 12 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

1

2  • **Susan of Lake Ozark MO (12/18/08):**  Our son had talked us into trying direct TV since he
3  had it for about 10 years, we installed our own dish and went to local Walmart and purchased
   the receiver off the shelf and paid cash for it, then called direct tv and had the service turned
4  on, that was in 2005.I was a good paying customer even though they deleted some of our
   channels and there is days when we had no service at all, but I never complained.  Then in
5  2008 we moved and asked to have the service discontinued and was told the receiver
6  belonged to them and we had to mail it back. They state that even though we purchased it, it
   was still a leased item, and that we'll be charged $470.00 if we don't mail it back. There was
7  no contract, no technician, and we were not informed about This or we would never have
   bought it or so we thought. …

8  • **Alan of Longmont CO (07/25/08)**: DIRECTV is charging me $380 for terminating a 2-year
9  contract that I never requested. My Tivo unit stopped working (long after my initial contract
   commitment had finished) and I called directv for repair. They sent me a new, inferior DTV
10 of their own design, which I did not request. They did not notify me of any commitment
   involved in the new DVR. When I realized how poor was the new DVR, I switched to
11 Comcast and returned the DVR to Directv. Then Directv notified me that the replacement
12 DVR was an upgrade, so it implied an additional 2 year commitment and that they expect me
   to pay $380 for the unexpired commitment. How can they rope me into a commitment
13 without my consent? …

14 • **Patrick of Hamilton NJ (07/24/08):**  Cancellation Fee - I was a DIRECTV customer for over
15 5 years and recently I upgraded to HD service. I had to buy a receiver that they made me
   return and when I cancelled service they bilked my credit card for $340. I called to complain
16 about never being told there was a cancellation fee if I wasn't happy with their service.

17 • **Michael of Palm Springs CA (07/16/08):**  I signed up for their current offer of 150 channels
   for 29.99 per month. They charged 62.97 on the first bill, and when I complained they
18 reluctantly lowered the monthly bill to 39.99. 10 dollars more than their current offer, so
   finely displayed on their webpage.  When I told them I wanted to cancel if they did not live up
19 to the offer they had confirmed to med via e-mail, the customer service person threatened me
   with significant amounts to be paid if I cancelled. So I am stuck in the sting operation called
20 Directv.

21 • **Yolanda of Pensacola FL (07/16/08)**:  I upgraded to an DVR 10/07. I got a better deal with
   another company so I called to cancel my service I have had DTV since 2004, so I knew my
22 contract was over. Well they informed me 07/15/2008 that I signed another contract when I
23 got the DVR, the only thing I signed was a work order that clearly states I got an upgrade.
   When I explained that no one told me that I would be locked into another 2 year contract they
24 were like you signed it and I know they're telling lies. So I called and requested the contract I
   signed because they're trying to charge me a cancellation fee of 187.00 for something I did
25 not sign and it was never explained to me. …

26 • **Bruce of Oceanside CA (06/19/08)**: We had been with Directv for nearly 7 years. Their
27 service went down and prices went up. We switched to cable and canceled the service in May
   of 08. We received a final bill showing a charge of $125.00 for early termination fee. Well,
28 we paid the remainder of the bill, leaving the $125 due. I called them asking the reason for it.

COMPLAINT                              - 13 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

They advised me that in April of 07, we activated a DVR. That's true, they had to send us a new one when the unit we had stopped working. They unknowing to us, started a 2 year contract! We were never informed or asked if This would be acceptable. If so, we would have cut the ties at that point. They are asking us to send in a dispute letter, yet they have already denied This request 3 times. Twice on the phone and once through their website. This is completely unethical behavior! We still have an outstanding balance of $125.00 and they are calling us trying to collect.

- **Joanne of Bogota NJ (05/01/08):** I had a malfunctioning DVR that was replace in 10-07 with a different model because the original model was no longer available. This new unit failed in 1-08 and was replaced. The second unit was failing and I canceled the service and had to return the unit. I was billed a $400 cancellation fee for early termination even though I had a DVR for over two years because activation of the unit in 10-07 created a two-year obligation. I tried to explain that I didn't sign a contact to This effect or remembered any disclosure about it, but to no avail. I only canceled the service because the neither of the new units worked properly or consistently. I was assessed a $400 cancellation fee for canceling a service that did not work as promised, after many tries at fixing the problem.

- **Lana of Bethesda MD (04/29/08)**: My significant other and I attended a Home Show at FedEX Field on March 29, 2008. Mr. Vincent Cottrell was at the exhibit booth representing DIRECTV. During her sales presentation, he explained the main cost difference between Comcast and her company is that with DIRECTV, customers purchase their equipment up front. Therefore, there are no monthly rental fees on the equipment, providing a substantial savings each month. Based on that information we agreed to a two-year contract for DIRECTV service. Upon receipt of the first bill, we noted there were fees of $4.99 for each receiver. When we inquired about this, we were told these are mirroring fees, not lease fees. Nevertheless, regardless of their name, Mr. Cottrell failed to divulge these monthly charges to us in her presentation. We attempted to contact Mr. Cottrell on several occasions but did not receive a return call. Furthermore, the upfront charges for the equipment paid on a credit card were in fact not to purchase the receivers but are actually lease charges too. Contrary to Mr. Cottrell's claim, the company states we DO NOT own any equipment. …

## Defendants' Misconduct

54.     The customer does not receive the Customer Agreement or the ELA until after their purchase of the DIRECTV equipment.  By that time, when the customer learns that he is only leasing the equipment, and/or subject to a Commitment Period, limited arbitration provisions, or early cancellation fees, he faces a $150 charge if he opts to forgo activating the equipment, and a $125 cost if he wishes to arbitrate her disagreement with DIRECTV.

COMPLAINT                              - 14 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

55.     The ECF and non-activation fees are not enforceable liquidated damages, but are

unenforceable penalties.  Defendants inclusion of them in the ELA, and threatened us of them,

comprise unconscionable business practices.  Plaintiffs base This claim upon the following:

a)     DIRECTV imposes the ECF without regard to the reason for termination of service.  If a customer moves, or experiences poor service, or simply cannot establish service, and wishes to discontinue DIRECTV services, DIRECTV will still charge the ECF. DIRECTV also imposes This fee when it elects to cancel service;

b)     DIRECTV imposes its ECF even upon customers who have had DIRECTV service for years, and were previous owners of their DIRECTV equipment, and had been customer for more than the Commitment Period;

c)     DIRECTV imposes its ECF upon customers who have never seen nor signed the Equipment Lease Addendum;

d)     The ECF is not reasonably related to any actual harm DIRECTV purportedly suffers from a customer cancelling service before the arbitrary period DIRECTV created as the "Programming Commitment."  For instance, DIRECTV charges customers $150 for failing to activate the equipment, but the moment it is activated, they raise the ECF to $360 for standard and to $480 for HD service.

e)     In addition, the ECF amounts are arbitrary.  By way of example, on or about March 2007, DIRECTV increased the ECF for customers who canceled standard or HD service from $150/$300 to $360/$480, respectively;

f)     DIRECTV imposes or threatens to impose the maximum ECF charge upon cancelling customers, no matter when within their Commitment Period they cancel;

56.     DIRECTV fails to disclose or adequately disclose that equipment upgrades or package

changes can trigger a new Commitment Period.  Customers often learn of This new Commitment

Period *only* when they attempt to cancel and DIRECTV automatically charges them the

Cancellation fee.

57.     DIRECTV fails to adequately inform purchasers of their equipment that they are merely

leaseholders, and are subject to $400-600 charges for the equipment if they do not send it back to

DIRECTV after cancellation.  Plaintiffs who purchased the equipment would not have spent

$150-$180 on DIRECTV equipment, plus monthly charges of $4.99, if they knew they would

have to return the equipment to DIRECTV.

COMPLAINT                                    - 15 -

**Plaintiffs' Experience with DIRECTV**

58.     Plaintiffs Paul and Karen Brice are Washington residents. They have been DIRECTV customers since January of 2009 when Ms. Brice ordered service directly through DIRECTV. She had been told by DIRECTV sales personnel that she would have the same service as her cable company provided, including "On Demand" programming. She received an ELA from her installer at the time her service began. She immediately learned that "On Demand" programming would not work on her three different sets. She contacted DIRECTV.

59.     After attempts were made to remedy this problem, she told DIRECTV she wanted to cancel her DIRECTV programming. She explained that DIRECTV had failed to keep their end of the bargain: that she would have the same access to channels and programming as her cable company provided.

60.     The Brices returned all the equipment to DIRECTV as it requested.

61.     Upon canceling her service, DIRECTV imposed a $411.44 ECF on her Bank of America credit card. Ms. Brice succeeded in reversing the charge.

62.     DIRECTV then set her account into collections, and sent a letter to Paul Brice. Ms. Brice responded by letter, disputing the charge.

63.     On September 15, 2009, the Brices received another letter from a collection agency regarding the DIRECTV ECF. The letter warned that if the Brices failed to pay the ECF, "you will be reported to one or more of the credit bureaus (TRW\Experian, Equifax and Transunion) and your credit record will be negatively affected." Fearing that the collection agency would report the ECF and damage her family's credit, Ms. Brice reluctantly paid the ECF of $411.44.

64.     Having paid $411.44, the Plaintiffs have suffered an ascertainable loss as a result of DIRECTV's conduct.

COMPLAINT                                           - 16 -

1

## CLASS ACTION ALLEGATIONS

2

65.     This action is brought as a class action pursuant to Federal Rules of Civil Procedure Rule

3

23(a)(1)-(4) , 23(b)(3), and seeks certification of two classes:

4

5         All former DIRECTV customers residing in the State of
          Washington, who had DIRECTV service in Washington, and who
          were charged an ECF, a non-activation fee or a fee for not sending

6         to DIRECTV equipment the consumer purchased ("Fee Class");
          and

7

8         All current DIRECTV customers residing in the State of
          Washington who are presently under contract with DIRECTV and
          face a fee if they terminate their DIRECTV service or do not send

9         to DIRECTV equipment the consumer purchased ("Commitment
          Period Class").

10

11

66.     Excluded from each of the Classes are Defendants, any entity in which Defendant have or

12

had a controlling interest, any officers or directors of Defendants, the legal representatives, heirs,

13

successors, and assigns of Defendants, any Judge assigned to this action and his or her  immediate

14

family, and anyone who timely requests exclusions from the Class.

15

16

67.     This action is properly maintainable as a class action.

17

68.     The Classes are composed of thousands of persons who signed up for DIRECTV service.

18

With a reported national customer base of over 17.3 million nationwide and a churn rate of 1.64%

19

each month, this means that nearly 285,000 customers cancel their DIRECTV service each

20

month.  On information and belief, thousands of these customers reside in the State of

21

Washington.

22

69.     Common questions of law and fact exist as to all members of the Classes and predominate

23

over any potential issues or claims unique to the Plaintiffs.  These common legal and factual

24

questions include, but are not limited to, the following:

25

26        a)      Whether Defendants marketed, advertised and sold its receivers to the Class using

27             false, misleading and/or deceptive statements or representations;

28

COMPLAINT                              - 17 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

b)      Whether Defendants failed to adequately disclose material information, such as that a change in service resulted in a new commitment period, and the possibility of an early cancellation fee;

c)      Whether Defendants' early cancellation and non-activation fees comprise an unenforceable penalty;

d)      Whether Defendants' conduct as described herein constitutes a violation of the Washington Consumer Protection Act;

e)      Whether as a result of this conduct, Defendants have unjustly enriched themselves;

h)      Whether the Commitment Class is entitled to declaratory relief on the legality of DIRECTV's fees;

j)      Whether the Fee Class is entitled to restitution;

70.     Because Plaintiffs' claims and the claims of absent members of the Classes all derive from a common nucleus of operative facts, Plaintiffs are asserting claims that are typical of the claims of each of the Classes.  Plaintiffs will fairly and adequately represent and protect the interests of the Classes in that they have no interests that are antagonistic to those of the other Class members.  Plaintiffs have retained counsel who are competent and experience in class action litigation.

71.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted in this case as joinder of all members of the Classes is impracticable and this action will present no manageability problems as a class action.  A single judgment also prevents the possibility of inconsistent and potentially conflicting judgments on identical claims.

## FIRST CAUSE OF ACTION

### (Violation of the Washington Consumer Protection Act – Both Classes)

COMPLAINT                                    - 18 -

72.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this

Complaint as if fully set forth herein.

73.     The Washington Consumer Protection Act ("CPA"), RCW 19.86.010 *et seq*, proscribes

unfair methods of competition and unfair or deceptive acts injurious to the public interests.  These

include engaging in any fraudulent or deceptive conduct which creates a likelihood of confusion

or misunderstanding.

74.     DIRECTV is a "person" within the meaning of the CPA, RCW 19.86.10(1) and conducts

"trade" and "commerce" within the meaning of RCW 19.86.010(2).

75.     Plaintiffs and other Class members are "persons" within the meaning of the CPA, RCW

19.86.010(1).

76.     Plaintiffs' payments for early cancellation penalties wrongfully obtained from Plaintiffs

and other class members constitute "assets" within the meaning of the CPA. RCW 19.86.010(3).

77.     Plaintiffs purchased DIRECTV for personal, family or household purposes and suffered

an ascertainable loss, in the form of an early cancellation fee.

78.     Defendants actions as alleged herein violate the CPA including, inter alia:

    a)      Defendants intended, or consciously disregarded, that Plaintiffs and

    absent Class members would rely on its omissions, misrepresentations, and

    practices so that customers would become enrolled in Commitment

    Periods, and face fees if they canceled service;

    b)      Defendants, through misrepresentations and/or omissions, enticed

    customers into their service with false promises about their services and

    then subjected customers to a cancellation fee for early termination of

    DIRECTV service;

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

c)      Defendants included invalid contractual terms, such as non-

activation and early cancellation fees, in their adhesive contracts that were

likely to mislead consumers into believing they must fulfill their

Commitment Period, or face early cancellation fees;

d)      Defendants' imposed non-activation fees and early cancellation fees

that do not reasonably forecast just compensation for the non-activation or

cancellation of service;

79.      Defendants' practices offend public policy, are immoral, unethical and oppressive, and

cause substantial injury to the consumer.

80.      Defendants' unfair or deceptive trade practices have occurred in its' trade or business, and

were and are capable of injuring or deceiving a substantial portion of the public.  Defendants'

general course of conduct has an impact on the public interest, and the acts complained of herein

are ongoing and /or have a substantial likelihood of being repeated.

81.      Defendants' practices are not outweighed by countervailing benefits to consumers, and, as

included in contracts of adhesion provided *after* the consumer purchased her or her DIRECTV

equipment, could not be reasonably avoided by the consumer.

82.      Defendants' unlawful conduct arose in the State of Washington where Plaintiffs and

absent Class members received and used the equipment and DIRECTV service, and caused injury

in the State of Washington.

83.      Plaintiffs and the Classes suffered actual damages from Defendants' violations of the

Washington Consumer Protection Act, *inter alia*, continuing DIRECTV service out of fear of

impositions of unlawful penalty provisions, and/or being charged improperly disclosed penalties

upon termination or non-activation.

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

84.     Plaintiffs and those similarly situated seek reimbursement for any fees imposed, injunctive relief, treble damages, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment – Fee Class)

85.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

86.     As a direct and proximate result of Defendant's unlawful acts and practices, Defendants have wrongfully collected funds from Plaintiffs.  These funds include any early cancellation or non-activation fees imposed upon the Fee Class.

87.     Defendants have received, and continue to receive, benefits at the expense of Plaintiffs and members of both Classes and it would be unjust for Defendants to retain these benefits.

88.     The Defendants procured such a benefit from the Plaintiffs and the putative classes through various unlawful practices as set forth herein.

89.     Under the circumstances as alleged herein, it would be unjust for the Defendants to retain the profits acquired through their unlawful practices.

## THIRD CAUSE OF ACTION

### (Relief of Unlawful Penalties)

90.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully set forth herein

91.     Defendants' ECF is an unlawful penalty, and unlawful under the common law of contracts in Washington because

    a)      It is wholly disproportionate to the harm, if any, that early cancellation may cause Defendants, especially in light of the return of its' equipment by Plaintiffs and Class members;

COMPLAINT                                          - 21 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

b)      It is not based upon a bona fide reasonable estimate of the damages, if any, Defendants may suffer as the result of an early cancellation, and

c)      The actual damage, if any, Defendants suffer upon return of their equipment is not difficult to ascertain and is well below that which they charge.

92.     Unlawful penalties such as imposed by Defendants violate public policy in Washington and are void and unenforceable.

93.     Plaintiffs and Class members have been damaged and will continue to be damaged by Defendants' imposition of unlawful penalties on its customers.

94.     Such wrongful actions and conduct are ongoing and continuing.  Unless Defendants are enjoined from continuing to engage in such wrongful actions and conduct, consumers will continue to be damages by Defendants' conduct.

95.     As a result of Defendants' unlawful acts, Plaintiffs and the Class have been subjected to unlawful fees.  Plaintiffs and the Class are entitled to declaratory and injunctive relief, as well as damages in the form of refund of any monies collected by Defendants including interest thereon, as well as attorneys' fees and costs as are allowed by law.

## **FOURTH CAUSE OF ACTION**

### **(Declaratory Judgment – Commitment Period Class)**

96.     Plaintiffs reallege and hereby incorporates all proceeding paragraphs of this Complaint as if they were wholly set forth herein.

97.     A dispute has arisen between Plaintiffs and Defendants as to whether Plaintiffs and Class members must pay cancellation fees specified in the ELA and Customer Agreement.  A similar dispute exists between Commitment Class members who opted not to activate their DIRECTV service, and case a non-activation fee as specified in the ELA.

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

98.     DIRECTV has informed Class members that they will seek to enforce the ECF if a customer cancels their service, for any reason, and immediately deduct the ECF from the customer's credit card, or send the matter to a collection agency.

99.     Class members wish the freedom to cancel service sooner than the end of the Commitment Period created by DIRECTV, and not to face an unreasonably high ECF or possible collections actions.

100.    Further, Plaintiffs contend that they did not agree to arbitration or to waive their rights to bring claims on behalf of a class.

101.    To the extent Defendants assert that the claims of Plaintiffs and the Class are limited to solely individual arbitration, and preclude use of the JAMS class procedures, Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §2201 in the form of a finding that such a purported agreement is void and unenforceable as against public policy and/or unconscionable in at least the following respects:

    a)     To the extent Defendants assert that an arbitration agreement waives Plaintiffs' right to bring their claims on behalf of the Class, such an arbitration agreement is unconscionable and unenforceable;

    b)     To the extent any such waiver of class claims exists in an arbitration agreement, it removes the only practicable way for consumers to deter and redress the wrongs alleged in this Complaint, thus making such an arbitration agreement unconscionable and unenforceable;

    c)     To the extent Defendants did not provide an arbitration agreement to Plaintiffs or the Class until after the DIRECTV receiver was purchased, if at all, such an arbitration agreement is unconscionable and unenforceable;

    d)     To the extent Defendants maintain the right to impose early fees mentioned in the

COMPLAINT                                  - 23 -

Cohen, Milstein, Sellers & Toll PLLC
1100 New York Ave NW, Ste 500 W
Washington D.C., 20005

ELA, the amounts are unreasonable, disproportionate to the harm DIRECTV suffers from the early cancellation of their services, and constitute unenforceable penalties, and Class members may cancel their service agreement without facing those penalties.

## PRAYER FOR RELIEF

1. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel of record to represent the Class;

2. For restitution, reimbursement or disgorgement of all fees;

3. Declaratory relief removing the fees contained in the lease agreement;

4. Enjoin Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with Defendants, as provided by law, from engaging in the unlawful and wrongful conduct set forth herein;

5. Award Plaintiffs and the Class compensatory and exemplary damages, as allowed by law;

6. Reasonable attorney's fees and costs;

7. Prejudgment and post-judgment interest, as provided by law; and

8. Any other relief deemed just by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 22, 2009

**TERRELL, MARSHALL & DAUDT, PLLC**

By: /s/ Toby J. Marshall, WSBA # 32726
Beth E. Terrell, WSBA # 26759
Email: bterrell@tmdlegal.com
Toby Marshall, WSBA # 32726
Email: tmarshall@tmdlegal.com
3600 Fremont Avenue N.
Seattle, Washington 98103
Phone: (206) 816-6603

1        Fax: (206) 350-3528

2        **COHEN MILSTEIN SELLERS & TOLL, PLLC**
Andrew N. Friedman
3        Douglas J. McNamara
Whitney R. Case
4        1100 New York Avenue, NW
Suite 500 West
5        Washington, D.C. 20005-3964
Phone: (202) 408-4600
6        Fax: (202) 408-4699

7

8        **SHALOV STONE BONNER & ROCCO LLP**
Lee S. Shalov
9        485 Seventh Avenue
Suite 1000
10       New York, New York 10018
Phone: (212) 239-4340
11       Fax: (212) 239-4310

12       *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT      - 25 -